## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TIMOTHY MACDUFF, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO. 3:20CV773 (RAR) |
| | : | |
| SIMON MANAGEMENT | : | |
| ASSOCIATES II, LLC., | : | |
| | : | |
| Defendant. | : | |

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Timothy MacDuff ("Plaintiff") brought this action against his former employer, SIMON Management Associates ("Defendant") for disability discrimination and retaliation under the Americans with Disabilities Act (ADA) (Counts One and Two), disability discrimination and retaliation under the Connecticut Fair Employment Practices Act (CFEPA) (Counts Three and Four), negligent infliction of emotional distress (Count Five), negligent misrepresentation (Count Six), breach of the covenant of good faith and fair dealing (Count Seven), and common law wrongful termination (Count Eight).[1] (Compl., ECF No. 1.) Defendant has moved for summary judgment on Counts 1 through 7.

---

[1] The common law wrongful termination claim has not been addressed in any of the briefs. The defendant addresses in a footnote that some of the claims were not addressed because they reference an FMLA leave, but the common law termination claim does not reference an FMLA leave. (Compl. ¶¶ 94-99, ECF No. 1.) From what the Court can tell, this claim has not been challenged on summary judgment. Additionally, the complaint mistakenly lists this as "Count Four," though numerically it is Count Eight, which is how the Court has referred to it.

(Def.'s Mem. L. Supp. Mot. Summ. J. ("Def.'s Br."), ECF No. 23-1). Plaintiff has filed a memorandum in opposition to summary judgment (Pl.'s Mem. L. Opp. Mot. Summ. J. ("Pl.'s Br."), ECF No. 28). For the reasons set forth below, defendant's motion is DENIED as to Counts One and Three, but GRANTED as to Counts Two, Four, Five, and Six, and Seven.

## **FACTS**

Plaintiff started his employment with defendant on May 21, 2018. (Pl.'s Local Rule 56(a)(2) ¶ 1, ECF No. 28-1.) Plaintiff was employed as the Operations Director for the Clinton Crossing Premium Outlets operated by defendant. (Id.) In this capacity, plaintiff worked directly under the General Manager of the Clinton Crossing outlet and indirectly under the Regional Director of Operations. (Id. at ¶ 5.) As part of his job, plaintiff was responsible for "[p]rioritiz[ing] capital projects to reflect critical needs and affordability" and "[m]anag[ing] the work process for both capital projects and ongoing services" from start to finish. (Def.'s Ex. 2, ECF No. 23-2.) This included utilizing defendant's specific protocols and programs, such as P2P and Anaplan, and creating "yellow folders" to record documentation related to projects. (Def.'s Ex. 4, ECF No. 23-2; Ramos Dep. 54:13-55:14, ECF No. 23-2; Langton Dep. 26:6-25, ECF No. 23-2.)

When he started the job, plaintiff inherited several capital projects that needed to be completed. (MacDuff Dep. 111:6-10., ECF No. 23-2.) These projects included a siding project (the EFIS project), restroom remodeling, and sign remodeling. (Id. 174:1-5.) A wastewater treatment project started roughly six weeks after plaintiff's employment began. (Id. 175:22-176:3.)

On August 7, 2018, Johnathan Andrews, who was the General Manager of the Clinton Crossing Premium Outlets, conducted a "60 Day Touchbase" with plaintiff. (Pl.'s Local Rule 56(a)(2) ¶ 6, ECF No. 28-1.) Andrews noted that plaintiff needed help with training and development, including policy and procedure, P2P, capital completions and bidding processes, and Anaplan. (Def.'s Ex. 4, ECF No. 23-2.) Shortly after plaintiff and Andrews met, Andrews was transferred to another SIMON property, and Nathan Ramos became the General Manager of Clinton Crossing. (Pl.'s Local Rule 56(a)(2) ¶ 7, ECF No. 28-1.)

After the 60-day touchbase, defendant arranged for plaintiff to train under another regional director. (MacDuff Dep. 132:1-134:10, ECF No. 23-2; Langton Dep. 22:23-25, ECF No. 23-2.) Robert Langton, Regional Director of Operations, also traveled to the Clinton Crossing outlets to give plaintiff extra training. (Langton Dep. 22:22-23, ECF No. 23-2.) Plaintiff's

training was focused on protocols, such as submitting requests for proposals and creating yellow folders. (Id. 26:7-8.)

In early October of 2018, Ramos had sought approval from human resources and the Regional Vice President, Denise Ipsen, to issue plaintiff a written warning due to Ramos's perception that plaintiff was unable to move forward with capital projects. (Ramos Dep. 46:17-47:7, 48:12-18, 50:7-13, ECF No. 23-2.) On November 23, 2018, Ramos issued the written warning through a Confidential Progressive Counseling Memo. (Def.'s Ex. 5, ECF No. 23-2.)

The counseling memo indicates it is "Step 2 or Step 3" of employee improvement, and the fine print at the bottom of the document says "[f]ailure to demonstrate the necessary rate of improvement may be cause for additional action, up to, and including, termination." (Def.'s Ex. 5, ECF No. 23-2.) The progressive counseling memo indicates that the issues contained in the memo were previously discussed with plaintiff on October 26, 2018, and November 9, 2018. (Id.; Ramos Dep. 61:1-8, ECF No. 23-2.) In the counseling memo, Ramos indicated that, "[t]he Operations Director's expectation is to: Manage and execute capital projects" and to "[h]ave a sense of urgency to execute tasks and respond to deadlines within the amount of time given." (Def.'s Ex. 5, ECF No. 23-2.) Ramos wrote that plaintiff's performance was deficient because "[c]apital projects have made

4

little to no movement within the time frame given including, EFIS, WWTP [wastewater treatment plant], sign re-branding and restroom renovation." (Id.)

Ramos also wrote that "[a]pproved projects are expected to be executed within the time frame given for current and future years plan." (Id.) The counseling memo ended with an Action Plan of tasks for plaintiff, including new proposed dates for the EFIS, wastewater treatment plant, sign re-branding, and restroom remodel projects. (Id.) Additionally, Ramos and plaintiff met on October 8, 2018, October 26, 2018, November 26, 2018, and November 28, 2018, to discuss plaintiff abiding by the expected schedule of 8:30 AM to 5:00 PM. (Def.'s Ex. 5, ECF No. 23-2.)

On November 23, 2018, plaintiff submitted his written responses to the progressive counseling memo. (Def.'s Ex. 6, ECF No. 23-2.) Plaintiff addressed certain events, such as not being on site during a snowstorm, and the delay in the capital projects. Plaintiff acknowledged some deficiency in documenting the capital projects ("I will own my portion of the documentation process") and stated that moving forward he would "increase communication regarding deadlines and information processing" because he "understand[s] the impacts upon the business for capital projects and day to day maintenance issues." (Id.)

After the issuance of the progressive counseling memo, Langton continued to support plaintiff, including specific guidance regarding prioritizing work. (Pl.'s Local Rule 56(a)(a) ¶¶ 9-10, ECF No. 28-1.) Ramos also started emailing tasks to plaintiff. (MacDuff Dep. 199:11-200:3, ECF No. 23-2.)

In January of 2019, plaintiff's 2018 Field Performance Review was conducted. The Field Performance Review contains a self-evaluation section for the employee to fill out. Ramos and plaintiff each gave plaintiff an overall score of "2-Needs Improvement." (Def.'s Ex. 7, ECF No. 23-2.) Both plaintiff and Ramos highlighted areas where plaintiff could improve, namely in adapting to SIMON policy and procedures and time management. (Id.)

On January 16, 2019, plaintiff submitted a letter to Katherine Meehan, Director of Human Resources, stating that he felt he was "being discriminated against due to [his] learning disability and [his] age." (Def.'s Ex. 8, ECF No. 23-2.) Plaintiff expressed his belief that the progressive counseling plan issued in November of 2018 was "punitive in nature, including some unrealistic and vague expectations, rather than serving as an instrument to assist and empower." (Id.) He also wrote: "I possess a neurological / biological disorder that worsens under the constant threat of one's job hanging in the balance." (Id.) In his letter, plaintiff requested certain

6

accommodations. More specifically, plaintiff requested a laptop computer, that he receive information in written format, and a quiet environment. (Id.)

On February 5, 2019, plaintiff formally submitted a request for reasonable accommodation asking for a laptop to "provide[] time and location flexibility."[2] (Def.'s Ex. 9, ECF No. 23-2.) On February 12, 2019, plaintiff submitted a letter from his primary care physician, Dr. Jorge Dabdoub, stating that plaintiff has attention deficit disorder ("ADD"). (Def.'s Ex. 10, ECF No. 23-2.) Dr. Dabdoub's letter indicated that a laptop would help plaintiff "stay connected" to work "while taking breaks." (Id.) Plaintiff testified at his deposition that the reason he requested a laptop was so that he would have the ability to take a break and change environments (from office to home) to accommodate his ADD. (MacDuff Dep. 241:5-10, ECF No. 23-2.)

While both Ramos and Langton were aware that plaintiff requested a laptop, neither was made aware that it was for the purpose of accommodating a disability. (Ramos Dep. 99:1-10, 102:3-9, 133:5-135:17, ECF No. 23-2; Langton Dep. 59:5-60:1, ECF No. 23-2; Pl.'s Local Rule 56(a)(2) ¶ 13, ECF No. 28-1.)

---

[2] Plaintiff also requested a "[b]usiness phone that is more reliable than existing Apple Phone" because his current work phone was older and frequently experienced glitches. (Def.'s Ex. 9, ECF No. 23-2.) This request does not appear to be related to plaintiff's ADD, and Ramos testified in his deposition that no one from HR had spoken to him about this request. The request is not mentioned in any of the briefs. Therefore, the Court will not address this request in relation to plaintiff's claims.

Sometime after submitting his request for accommodations, plaintiff received a letter from a third-party administrator rejecting his request for a laptop based upon his position. (MacDuff Dep. 203:11-19, ECF No. 23-2.) At some point, plaintiff rearranged the furniture in his office and began closing his office door so that he would have less audio/visual distractions. (Def.'s Ex. 8, ECF No. 23-2; MacDuff Dep. 196:20-197:17, 209:21-25, ECF No. 23-2; Ramos Dep. 70:7-8; 102:18-103:20, ECF No. 23-2.)

On March 11, 2019, defendant issued plaintiff a second progressive counseling memo. (Def.'s Ex. 12, ECF No. 23-2.) The second counseling memo indicated that it was a final written warning and that the consequence for failure to meet the action plan would be termination. (Id.) This second progressive counseling memo was issued by Ramos with the support and approval of Ipsen. (Ramos Dep. 120:6-14, ECF No. 23-2.) The second counseling memo also included feedback from Langton. (Langton Dep. 64:1-11, ECF No 23-2.) The memo indicates that the issues therein were previously discussed with plaintiff on November 29, 2018, December 28, 2018, January 11, 2019, and March 6, 2019. (Id.; Pl.'s Local Rule 56(a)(2) ¶ 16, ECF No. 28-1.) The second counseling memo indicated that plaintiff did not meet several deadlines and had performance issues with the EFIS and bathroom remodeling projects that had been in place since

8

plaintiff started. (Def.'s Ex. 12, ECF No. 23-2.) In the second counseling memo, Ramos wrote, plaintiff "continues to underperform within his role and struggles to meet deadlines, manage the day to day operations, multi task and communicate effectively." (Id.)

Plaintiff submitted a written response to the second progressive counseling memo. (Def.'s Ex. 13, ECF No. 23-2.) In explaining why he missed a deadline for light timers, plaintiff wrote, "Disclosed early on to GM that home computer was having difficulty connecting to SIMON systems and having a laptop as opposed to a desk top [sic] computer for work would greatly assist me, in completing projects on time." (Id.)  Responding to Ramos's comment that he underperforms, plaintiff wrote, "These types of issues I have managed well in previous positions, due to the use of a laptop computer and a somewhat flexible schedule, and other low-cost or no cost accommodations." (Id.)

After the issuance of the second progressive counseling memo, Langton continued to have discussions with and assist plaintiff, even providing him with another mentor. (Langton Dep. 69:22-71:1, ECF No. 23-2.)

On April 1, 2019, Dr. Dabdoub submitted a second letter to defendant. (Def.'s Ex. 14, ECF No. 23-2.) Dr. Dabdoub included a list of accommodations that would benefit plaintiff, including a laptop computer, restructuring the approach to deadlines, having

weekly meetings, adjusting the method of supervision, and clear performance plans. (Id.) In explaining the recommendation for a laptop, Dr. Dabdoub wrote: "Provides him the ability to contribute to his company, after the closing of the posted office hours. Patients with ADD benefit from a break after a full day of brain stimulation. The computer would allow him to resume work at home after the brain regenerates and is ready for continued productivity." (Id.)

On April 4, 2019, Ramos emailed Meehan, Ipsen, and Langton to recommend the termination of plaintiff's employment. (Langton Dep. 76:8-12, ECF No. 23-2.) On April 23, 2019, defendant terminated plaintiff's employment.

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure allows a party to move for summary judgment on any or all claims, which the Court must grant "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). At this stage of litigation, courts must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [that party's] favor." Gary Friedrich Enters., LLC v. Marvel

Characters, Inc., 716 F.3d 302, 312 (2d Cir. 2013). The non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" if the movant satisfies the burden of showing no genuine dispute of material fact. Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 44 (2d Cir. 2015). "The party opposing summary judgment must do more than vaguely assert the existence of some unspecified disputed material facts or 'rely on conclusory allegations or unsubstantiated speculation.'" Gary v. Nordstrom, 3:18cv1402 (KAD), 2020 WL 5709632, at *1 (D. Conn. Sept. 24, 2020). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (internal quotation marks and citation omitted). The Court cannot "make credibility determinations or weigh the evidence," when considering a motion for summary judgment, as these are functions for a jury. Proctor v. LeClaire, 846 F.3d 597, 608 (2d Cir. 2017) (citation omitted).

## DISCUSSION

Defendant seeks summary judgment on the claims of disability discrimination and retaliation under the ADA and CFEPA, negligent infliction of emotional distress, breach of the

covenant of good faith and fair dealing, and negligent
misrepresentation. Plaintiff agrees that defendant should be
granted summary judgment on the claims for negligent infliction
of emotional distress (Count Five) and breach of the covenant of
good faith and fair dealing (Count Seven). Therefore, summary
judgment is GRANTED on those claims.

The remaining claims at issue are: disability
discrimination, retaliation, and negligent misrepresentation.

### 1. Disability Discrimination (Counts One and Three)

"Connecticut courts generally analyze ADA and CFEPA claims
under the same standard." Willoughby v. Conn. Container Corp.,
No. 11-cv-00992(CSH), 2013 WL 6198210, at *16 (D. Conn. Nov. 27,
2013) (citations and internal quotation marks omitted); *see also*
Russell v. Drivers Mgmt., LLC, No. 19-cv-682 (JCH), 2020 WL
7419664, at *4 n.2 (D. Conn. Feb. 11, 2020) (analyzing ADA and
CFEPA claims together).

Disability discrimination claims are subject to the burden
shifting framework set forth in McDonnell Douglas Corp. v.
Green, 411 U.S. 792 (1973) and McMillan v. City of New York, 711
F.3d 120, 125 (2d Cir. 2013).  At step one of the analysis, the
plaintiff must establish a *prima facie* case of disability
discrimination. If the plaintiff establishes a *prima facie* case,
the burden then shifts to the employer to proffer a non-
discriminatory reason for the adverse action. St. Mary's Honor

Center v. Hicks, 509 U.S. 502, 509 (1993). If the employer is able to articulate a legitimate, non-discriminatory reason for the adverse action, the presumption of discrimination is rebutted and the burden shifts back to the plaintiff to demonstrate that the employer's proffered explanation for the adverse action is pretextual. Id. at 516-19.

A plaintiff must, by a preponderance of the evidence, show that:

> (1) [the] employer is subject to the ADA; (2)
> Plaintiff suffers from a disability within the meaning
> of the ADA; (3) Plaintiff could perform the essential
> functions of [her] job with or without reasonable
> accommodation; and (4) Plaintiff was fired or
> otherwise discriminated against because of his
> disability.

Szuszkiewicz v. JPMorgan Chase Bank, 257 F. Supp. 3d 319, 326 (E.D.N.Y. 2017); see also Alexander v. DiDomenico, 324 F. App'x 93, 95 (2d Cir. 2009) (citing Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir.2004)).

### a. Plaintiff has established a *prima facie* case

Both parties agree that defendant is an entity covered by the ADA and that plaintiff's ADD falls within the definition of disability under the ADA.

As to the essential functions of the position, plaintiff argues that he was able to perform all of the essential functions of his position and that the laptop accommodation was "meant to enhance Plaintiff's performance." (Pl.'s Br. 7, ECF

13

No. 28.) Defendant does not argue that there was a specific function that plaintiff could not perform with or without an accommodation. Instead, defendant focuses on plaintiff's performance issues. (Def.'s Br. 18-19, ECF No. 23-1.) Because there is no dispute between the parties that plaintiff could perform the essential functions of his position, this element of the *prima facie* case has been satisfied.

Since it is undisputed that plaintiff's employment was terminated, plaintiff can establish that he suffered an adverse employment action. However, the defendant argues that plaintiff has no factual support for the fourth required element of the *prima facie* case, that he suffered an adverse employment action <u>because</u> of his disability.

"For a plaintiff to establish that he suffered adverse employment action because of his disability, '[t]he employer's decision makers must have notice of the disability for the employer to be held liable under ADA; otherwise, discrimination cannot be 'because' of a disability.'" <u>Choleva v. New England Stair Co., Inc.</u>, No. 3:18-CV-756 (JBA), 2020 WL 3976969, at *5 (D. Conn. July 14, 2020)(quoting <u>Alleva v. Crown Linen Serv., Inc.</u>, No. 3:14-CV-1971 (MPS), 2016 WL 4717758, at *6 (D. Conn. Sept. 8, 2016)); *see also* <u>Tennial v. United Parcel Serv., Inc.</u>, 840 F.3d 292, 306 (6th Cir. 2016)("An employee cannot be subject to an adverse employment action based on his disability unless

the individual decisionmaker responsible for his demotion has knowledge of that disability."); Perrotti v. A. Duie Pyle, Inc., No. 3:14-CV-0285(AWT), 2015 WL 11237027, at *8 (D. Conn. Sept. 21, 2015) (granting summary judgment where the decision-makers testified that they were not aware of plaintiff's disability, and there was "no evidence that any of them had such knowledge, and, most significantly, [plaintiff] fails to create a genuine issue as to whether the decision maker . . . knew [plaintiff] had a disability or viewed him as having a disability at the time he instructed Robidoux that [plaintiff's] employment should be terminated. . . .").

In Pacenza v. IBM Corporation, No. 04 Civ. 5831 (PGG), 2009 WL 890060 (S.D.N.Y. Apr. 2, 2009), the court granted partial summary judgment because plaintiff could not show that his employer was aware of his disability. Mihans, who was plaintiff's direct supervisor, and Meigel, who was Mihan's supervisor, made the termination decision. "When questioned at his deposition as to whether he told Mihans or Meigel about his PTSD, [plaintiff] explained 'Not in so many words. It is not something that you go tell people – you don't tell people that....'" Id. at *6.  Plaintiff never asked anyone for help with his PTSD and did not identify his PTSD at the time of termination. Id.  Mihans testified that he had no knowledge of

plaintiff's PTSD at the time of termination. Id. In granting

partial summary judgment, the court held that plaintiff

> has not demonstrated that his employer – specifically,
> the supervisor who decided to terminate his employment
> – was aware of his alleged PTSD disability.  Absent such
> proof, a plaintiff cannot meet his burden of
> demonstrating causation, because 'if [an employer] were
> truly unaware that. . . a disability existed, it would
> be impossible for [an] [employment] decision to have
> been based, even in part, on respondent's disability.

Id. at *10.  In affirming the grant of summary judgment, the

Second Circuit stated that "[b]ecause Plaintiff did not adduce

evidence that his supervisor had knowledge of his disability, he

failed to make a *prima facie* showing of discrimination under the

ADA." Pacenza v. IBM Corp., 363 F. App'x 128, 130–31 (2d Cir.

2010)[3]; see also O'Rourke v. Tiffany & Co., No. 16-626 WES, 2020

WL 1492865, at *6 (D.R.I. Mar. 27, 2020), aff'd, 988 F.3d 23

(1st Cir. 2021)(plaintiff was required to put forth evidence

that she was discharged in whole or in part because of her

disability and a "critical piece of this causal nexus is that

the decision-maker has knowledge of an employee's disability

prior to discharge.")

---

[3] The Second Circuit also cited and quoted the Supreme Court's ruling in
Raytheon Co. v. Hernandez, 540 U.S. 44 (2003). In Raytheon, the Court noted
that "[t]he Court of Appeals did not explain,. . . , how it could be said
that [the decision-maker] was motivated to reject respondent's application
because of his disability if [the decision-maker] was entirely unaware that
such a disability existed. If [the decision-maker] were truly unaware that
such a disability existed, it would be impossible for her hiring decision to
have been based, even in part, on respondent's disability." Id. at 55.

Defendant SIMON argues that plaintiff cannot show that the decision-makers were aware of plaintiff's disability.  More specifically, Ramos and Langton both testified under oath that plaintiff never mentioned his disability or medical condition to them. (Ramos Dep. 134:1-135:17, ECF No. 23-2; Langton Dep. 91:15-25, ECF No. 23-2). After reviewing the record, the Court is unable to find any evidence or assertion by plaintiff that he supposedly told Ramos or Langton about his disability.[4]

Although plaintiff submitted letters to the Human Resources Director which mentioned his disability, plaintiff admits that Ramos was not made aware of those submissions. (*See* Pl.'s Local Rule 56(a)(2) at ¶¶ 13-14, ECF No. 28-1.) Additionally, Ramos testified that he was never shown copies of the letters that were written by plaintiff's doctor. (Ramos Dep. 99:4-103:20, 106:1-107:1, ECF No. 23-2.)  There are no facts in the record that suggest otherwise.

Plaintiff notes that he sent a letter requesting a reasonable accommodation to Meehan, the Human Resources Director, (Pl.'s Br. 10, ECF No. 28), and argues that

> Considering that plaintiff worked in the "operations" department, it was Kathrine Meehan's job as Human Resources Director to inform operations personnel of his request. If one works as a Human Resources Director and

---

[4] In response to undisputed fact No. 14, plaintiff admits that he never told Ramos about his ADD. (Pl.'s Local Rule 56(a)(2) ¶ 14, ECF No. 28-1.) After reviewing the record, including the excerpts from plaintiff's deposition, the Court cannot find any evidence or assertion that plaintiff told Langton about his medical condition either.

receives a letter from an employee which states that
said employee has a disability and is requesting
accommodations, that director would relay that request
to all relevant parties.  Not only did the plaintiff
send a letter to a Human Resources Director wherein he
requested said accommodations, he also mentioned the
requested accommodations to Ramos, his supervisor.
Considering that plaintiff sent the letter to Kathrine
Meehan and told Ramos that he had requested
accommodations, operations personnel had to have known
that he made the request.

(Id. at 10-11.)

The Court will address each of these arguments
individually. First, plaintiff has not identified any facts in
the record that suggest that Meehan told Ramos or Langton about
his disability.

Second, although plaintiff's brief asserts that plaintiff
"mentioned the requested accommodations to Ramos" and that
plaintiff "told Ramos that he had requested accommodations,"
(id. at 10-11), the more accurate summary of the evidence in the
record is that plaintiff told Ramos that he needed a laptop.
(Ramos Dep. 68:22-69:22.) It does not appear that plaintiff ever
told Ramos that he needed the laptop as an accommodation for a
disability or that he needed any accommodation at all for a
disability.

The record shows that, in January of 2019, after being put
on notice of performance issues, plaintiff sent a letter to
Meehan, (Pl.'s Local Rule 56(a)(2) ¶¶ 12-13, ECF No. 28-1), and
the letter requested certain accommodations, including a laptop.

18

(Id. at ¶ 13.) Thereafter, in March of 2019, plaintiff received a progressive counseling memo from Ramos. (Def.' Ex. 13, ECF No. 23-2.) In his response to the memo, plaintiff addressed some of the alleged performance issues, and told Ramos that, early on, he had disclosed to his "GM that home computer was having difficulty connecting to SIMON systems and having a laptop as opposed to a desktop computer for work would greatly assist [plaintiff], in completing projects on time." (Id.) In response to Ramos's comment that plaintiff underperforms, plaintiff also stated that he managed these types of issues well at other jobs "due to the use of a laptop computer and a somewhat flexible schedule, and other low-cost or no cost accommodations." (Def.'s Ex. 13, ECF No. 23-2.) These statements, alone, would not have put Ramos on notice that the laptop was being requested as an accommodation for a disability.[5]  While the second statement in plaintiff's written response makes a passing reference to low-cost or no cost accommodations, the statement would not put Ramos on notice that the need for a laptop is in any way linked to a medical condition or disability. *See* Medlin v. Rome Strip

---

[5] Ramos testified that plaintiff did not mention his medical condition when he requested the laptop, and that plaintiff did not indicate that the laptop was being requested as an accommodation for a disability. (Ramos Dep. 134:1-135:17, ECF No. 23-2.) The Court has reviewed the record, including plaintiff's deposition transcript, and is unable to find any facts that suggest that plaintiff said or did anything to put Ramos on notice that the request for the laptop was somehow related to a disability or was intended to be an accommodation for a disability.

Steel Co., 294 F. Supp. 2d 279, 292 (N.D.N.Y. 2003)(noting that "so long as the employee makes the employer aware of his condition and that some accommodation is requested, the employer has at least some responsibility to reasonably engage in the interactive process and determine the appropriate accommodation"). Plaintiff's statement did not make Ramos aware of his condition, and, as noted earlier, there are no facts in the record that suggest that plaintiff ever told Ramos about the disability.

Although there is no evidence that Ramos or Langton knew of plaintiff's disability, the evidence shows that Meehan, the Human Resources Director, was aware of the disability and the request for accommodations. It is undisputed that Meehan approved the decision to terminate plaintiff's employment. [6] (Pl.'s Local Rule 56(a)(2) ¶ 20.) The Court finds that Meehan's

---

[6] Defendant argues that since Meehan was involved in both the hiring and termination decisions, the same-actor inference undermines any inference of discrimination. The Second Circuit has not yet extended the same actor inference to disability discrimination claims. Feingold v. New York, 366 F.3d 138, 155 n.15 (2d Cir. 2004) ("We do not pass judgment on the extent to which [the same actor] inference is either required or appropriate outside the Age Discrimination in Employment Act (ADEA) context in which it is generally applied."). However, even if the same actor inference applies to disability discrimination cases, it is not a necessary inference. As the court observed in Copeland v. Rosen, 38 F. Supp. 2d 298, 305 (S.D.N.Y. 1999), "[t]he 'same actor' inference is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand." The Court finds that the same actor inference should not apply here. In this case, it is undisputed that, at the time of plaintiff's hire, Meehan was unaware of plaintiff's disability. (Pl.'s Local Rule 56(a)(2) ¶¶ 2, 13, ECF No. 28-1.) Meehan did not become aware of the disability until January 16, 2019, approximately eight months after plaintiff was hired. (Id. at ¶¶ 1, 2, 13.)

role in the termination process, coupled with her knowledge of
plaintiff's disability and request for accommodation, are
sufficient to establish that a decision-maker knew of the
disability.

### b. Defendant has proffered a legitimate non-discriminatory reason for the termination.

Defendant has proffered a legitimate, non-discriminatory
reason for terminating plaintiff's employment: poor performance.
Defendant notes that it documented plaintiff's poor performance
before he ever notified Meehan of his disability.  More
specifically, the 60-day touchbase and the progressive
counseling memo from November 2018 predate plaintiff's request
for reasonable accommodations. In further support of the non-
discriminatory explanation, defendant notes that plaintiff's own
negative self-assessment in his 2018 annual review is consistent
with the very performance issues defendant raised and relied
upon when it terminated plaintiff's employment. (Def.'s Br. 18,
ECF No. 23-1.)

### c. Pretext

At step three of the McDonnell Douglas analysis, the burden
shifts back to the plaintiff to demonstrate that the employer's
proffered reason for termination is pretextual. "The extent of
[the plaintiff's burden] varies on a case-specific basis and
depends on the strength of the plaintiff's *prima facie* case, the

probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case." McEvoy v. Fairfield Univ., No. 3:17-cv-1861(MPS), 2019 WL 5579375, at *9 (D. Conn. Oct. 29, 2019) (internal quotation marks and citations omitted). The plaintiff must also "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

Plaintiff argues that the explanation for his termination is pretextual because defendant was aware of his requests for accommodation and denied the requests without providing any explanation other than stating that other Operations Directors did not have laptops. (Pl.'s Br. 11, ECF No. 28.) Plaintiff asserts that the defendant then terminated his employment for performance issues caused by his disability. (Id.) Plaintiff argues that, given the circumstances, his termination for performance reasons is really a termination due to his disability.

Defendant argues that plaintiff has not put forth enough evidence to satisfy his burden of demonstrating pretext. Defendant argues that plaintiff received poor performance

ratings before anyone at the defendant company was aware of plaintiff's disability, undercutting any argument that the criticism was because of his disability.  Defendant notes that the 60-day touchbase and the progressive counseling memo predate plaintiff's requests for reasonable accommodations.  The 60-day touchbase and counseling memo demonstrate plaintiff's performance issues with SIMON protocols and with the capital projects. Defendant also notes that the progressive counseling memo from March of 2019, which post-dates the request for accommodations, shows little to no movement on all the capital projects. Defendant also argues that the negative performance rating that plaintiff gave himself in his 2018 annual review is consistent with defendant's assessment of plaintiff's performance. As defendant notes, each of these evaluations, occurring both before and after plaintiff informed defendant of his disability, are consistent, thereby undermining plaintiff's argument that defendant discriminated against him based on his disability. (Def.'s Br. 18, ECF No. 23-1.)

Since all doubts and ambiguities must be construed in favor of the plaintiff, the Court finds that the plaintiff has raised a sufficient factual dispute to survive summary judgment.

The Second Circuit has held that an employer's "[f]ailure to consider the possibility of reasonable accommodation for . . . disabilities, if it leads to discharge

for performance inadequacies resulting from the disabilities,"
amounts to a discharge solely because of the disabilities."
Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 143 (2d Cir.
1995). Here, plaintiff alleges that he requested a laptop as an
accommodation and defendant denied the request without any
explanation other than telling plaintiff that other Operations
Directors did not have laptops.[7]  There is a significant gap in
the record as to what Meehan did in response to plaintiff's
request for accommodations. Neither party submitted sworn
testimony from Meehan as to what she did in response to the
request for accommodations or what, if anything, she told the
decision-makers about the request for the laptop.

    As discussed earlier in this decision, Ramos denies being
told of plaintiff's disability or request for accommodations,
and there is no evidence in the record to contradict Ramos'
sworn testimony. However, the failure of both parties to mention
what the defendant did or did not do in response to plaintiff's

---

[7] Defendant's statement of undisputed facts, (Def.'s Local Rule 56(a)(2) ¶
15, ECF No. 23-2), states that "[w]hile [plaintiff] was not provided with a
laptop and permission to regularly work from home, this was consistent with
the treatment of other Operations Directors and the explicit expectation that
they be on-site to perform their day-to-day duties."  Plaintiff's response to
fact number 15 does not specifically deny the portion that states that there
was an explicit expectation that Operations Directors were required to be on-
site to perform their day-to-day activities. (Pl.'s Local Rule 56(a)(2) ¶ 15,
ECF No. 28-1.)  Neither party's brief addresses this factual assertion when
discussing the requested accommodation under Counts One and Three. Defendant
does discuss this requirement when discussing the negligent misrepresentation
claim and asserts that the requirement of being on site was one of the
reasons that plaintiff's request for the laptop was denied.

request for accommodations raises questions of fact.  More
specifically, did Meehan, armed with the knowledge that the
request for a laptop was intended as an accommodation for a
disability and to help cure performance issues caused by
plaintiff's disability, simply convey a request for a laptop to
Ramos with no further explanation?  While it may be true that
other Operations Directors did not have laptops, that would not
excuse the defendant from providing a laptop to plaintiff <u>if</u> it
was a reasonable accommodation and did not create an undue
hardship.[8]

    If, as plaintiff asserts, the requested accommodation
(i.e., the laptop) would have addressed some of plaintiff's
performance problems, the fact that plaintiff had already been
criticized for poor performance before requesting the
accommodation would not be fatal to his disability
discrimination claim. Meehan knew that plaintiff had requested
the laptop as an accommodation for his disability and that,
according to plaintiff's doctor, the laptop would help address
at least one performance issue that was related to or associated
with plaintiff's disability. More specifically, plaintiff had
submitted a letter from Dr. Dabdoub stating that plaintiff would

---

[8] While some of the undisputed facts that were proposed and admitted (Pl.'s
Local Rule 56(a)(2) ¶ 15, ECF No. 28) suggest that the defendant may have had
other reasons or justifications for denying the requested accommodation,
neither party's brief discusses those facts or makes arguments that
incorporate those facts.

"benefit from a break after <u>a full day of brain simulation,</u>" and
"that the laptop 'would allow [plaintiff] to <u>resume</u> work at home
after the brain regenerates and is ready for continued
productivity.'" (Pl.'s Br. 7, ECF No. 28)(emphasis supplied in
original).[9] Given Meehan's knowledge of these facts, a jury could
potentially conclude that her decision to approve the
termination for poor performance was pretextual. (Ramos Dep.
36:16-37:24, 128:16-19, ECF No. 23-2; Pl.'s Local 56(a)(2) ¶ 20,
ECF No. 28-1.)

For these reasons, defendant's motion for summary judgment
is DENIED as to Counts One and Three.

### 2. Retaliation (Counts Two and Four)

The burden-shifting framework laid out in <u>McDonnell
Douglas</u> also governs retaliation claims. <u>Gomez v. Metro. Dist.</u>,
10 F. Supp. 3d 224, 235 (D. Conn. 2014).

To prove a claim of retaliation under the ADA and CFEPA,
the plaintiff must show: "(1) [he] was engaged in an activity
protected by the ADA, (2) the employer was aware of that
activity, (3) an employment action adverse to the plaintiff

---

[9] In his Rule 56(a) Statement, plaintiff admitted that he could access
SIMON resources from his home computer. (Pl.'s Local Rule 56(a)(2) ¶ 15, ECF
No. 28-1.) Presumably, defendant included this undisputed fact to show that
plaintiff did not need a laptop. However, the evidence shows that plaintiff
informed Ramos that he was having difficulty connecting to SIMON systems and
that having a laptop would greatly assist him in completing projects on time.
(Def. Ex. 13, ECF No. 23-2.). Once again, the record is very unclear as to
what Meehan and Ramos discussed in relation to plaintiff's request for a
laptop.

occurred, and (4) there existed a causal connection between the protected activity and the adverse action." <u>Equal Employment Opportunity Comm'n v. Day & Zimmerman NPS, Inc.</u>, 265 F. Supp. 3d 179, 199 (D. Conn. 2017) (quoting <u>Muller v. Costello</u>, 187 F.3d 298, 311 (2d Cir. 1999)); <u>Gomez</u>, 10 F. Supp. at 235.  The plaintiff's burden at this stage is slight, and the *prima facie* case may be met with de minimis evidence. <u>Weichman v. Chubb & Son</u>, 552 F. Supp. 2d 271, 288 (D. Conn. 2008).

       a. <u>Plaintiff has established a *prima facie* case of retaliation.</u>

Assessing plaintiff's *prima facie* case, plaintiff has established that he engaged in a protected activity when he requested an accommodation for his disability under the ADA. *See* <u>Muller v. Costello</u>*,* 187 F.3d 298, 311 (2d Cir. 1999) (holding that retaliation claim can be based on, *inter alia,* request for reasonable accommodation).

Additionally, the plaintiff can establish that the defendant was aware of the protected activity.  The Second Circuit has held that in establishing a *prima facie* case of retaliation, nothing more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity. <u>Reed v. A.W. Lawrence & Co.</u>, 95 F.3d 1170, 1178 (2d Cir. 1996); <u>Alston v. New York City Transit Auth.</u>, 14 F. Supp. 2d 308, 311 (S.D.N.Y. 1998)("In order to satisfy the second

prong of her retaliation claim, plaintiff need not show that individual decision-makers within the NYCTA knew that she had filed EEO and EEOC complaints."). The defendant was aware of plaintiff's request for accommodations because plaintiff made the requests to defendant's Human Resources Director, Meehan.

Since plaintiff's employment was terminated, plaintiff can establish that he suffered an adverse action.

With respect to the fourth element of the *prima facie* case, courts within the Second Circuit have held that "'a plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action.'" Gorman-Bakos v. Cornell Cooperative Extension of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001)(internal citations and alterations omitted); *see also* Gomez v. Metro. Dist., 10 F. Supp. 3d 224, 236 (D. Conn. 2014).  As the Honorable Janet Bond Arterton observed in Gomez,

> There is no "bright line to define the outer limits
> beyond which a temporal relationship is too attenuated
> to establish a causal relationship between the exercise
> of a federal constitutional right and an allegedly
> retaliatory action," and a court must "exercise its
> judgment about the permissible inferences that can be
> drawn from temporal proximity in the context of
> particular cases." *Summa,* 708    F.3d    at    128
> (quoting *Espinal v. Goord,* 558 F.3d 119, 129 (2d
> Cir.2009)). *Compare Hollander v. American Cyanamid
> Co.,* 895 F.2d 80, 85-86 (2d Cir.1990) (finding a lack of
> evidence that an adverse action, taken three months
> after the plaintiff's EEOC complaint, was in response to

28

the plaintiff's protected activity), *with Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45–46 (2d Cir.1980) (finding that the lapse of eight months between an EEOC complaint and retaliatory act indicated a causal connection).

Gomez, 10 F. Supp. at 236.

Plaintiff argues that the temporal proximity in this case is sufficient to create an inference that there was a causal connection between the protected activity and the adverse action. Plaintiff made his request for accommodations on January 16, 2019. (Def.'s Ex. 8, ECF No. 23-2.) Plaintiff was then terminated on April 23, 2019, approximately three months after the request for accommodations.

In support of his position that he has produced sufficient facts to support an inference, plaintiff relies on Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County, 252 F.3d 545 (2d Cir. 2001), in which the court held that the passage of a few days, two months, or three months between plaintiffs' First Amendment activities and the retaliatory events was enough to establish an inference of a causal connection. Id. at 555. The Court agrees that the facts in this case are sufficient to create an inference of a causal connection. *See* Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010)("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation,

we have previously held that five months is not too long to find
the causal relationship."); Hopkins v. Bridgeport Bd. of Educ._,
834 F. Supp. 2d 58, 67 (D. Conn. 2011)("three month period could
allow for an inference of causation" in a retaliation case);
Suggs v. Port Authority of N.Y. & N.J., No. 97civ4026 (RPP),
1999 WL 269905, at *6 (S.D.N.Y. May 4, 1999) (inference of
retaliation created where plaintiff was terminated
six months after filing an EEOC charge).

### b. Defendant has proffered a legitimate non-retaliatory reason for the termination.

As noted in the Court's analysis of Counts One and Three,
the defendant has articulated a non-retaliatory reason for
plaintiff's termination.  More specifically, defendant asserts
that plaintiff was terminated for poor performance.

### c. Pretext

The Second Circuit has routinely held that while temporal
proximity may establish a *prima facie* case for retaliation, it
is not enough to demonstrate pretext at the summary judgment
stage. Abrams v. Dep't of Public Safety, 764 F.3d 244 254-55 (2d
Cir. 2014); Zann Kwan v. Andalex Group LLC, 737 F.3d 834 (2d
Cir. 2013); El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933
(2d Cir. 2010). Courts within the District of Connecticut have
stated that "mere temporal proximity between an employee's
protected activity and a subsequent adverse employment action

will not support an inference of a causal connection where the
employer had already begun taking adverse employment actions
against the employee prior to the employee's engagement in any
protected activity." Bryant v. Greater New Haven Transit Dist.,
8 F. Supp. 3d 115, 133 (D. Conn. 2014) (citing Smith v. Da Ros,
777 F. Supp. 2d 340, 357 (D. Conn. 2011)).

Relying on this line of cases, the defendant argues that it
is undisputed that prior to the date that plaintiff disclosed
his disability to Meehan and asked for an accommodation,
defendant had already criticized plaintiff for the very
performance problems that led to plaintiff's termination.
(Def.'s Br. 18, ECF No. 23-1.) Defendant notes that the same
deficiencies that existed and were pointed out before the
protected activity and continued to persist through the date of
his final warning and termination.  (Id.)  Defendant asserts
that

> the undisputed record reveals that [plaintiff] was
> expressly advised to learn [SIMON]'s policies and
> procedures by Mr. Andrews in August 2018, he was formally
> counseled for failing to advance projects in accordance
> with policies and procedures in November 2018, and again
> formally warned in March 2019.  Despite this guidance,
> he failed to properly process projects causing them to
> languish, including several that had been pending since
> his arrival in May 2018.

(Id.)  Thus, the defendant argues that because the company
started the performance-based discipline before plaintiff ever
disclosed his disability or requested the accommodations, the

evidence of the temporal proximity between the protected activity and the adverse action is insufficient, standing alone, to establish pretext. (Id. at 22.)

Plaintiff argues that the nature of the discipline escalated after he engaged in the protected activity.  Plaintiff argues that prior to his request for accommodations, "Defendant had not indicated that he was going to lose his job." (Pl.'s Br. 10, ECF No. 28.)  However, shortly after plaintiff requested the accommodations, his employment was terminated.

In Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87 (2d Cir. 2001), as amended (June 6, 2001), the plaintiff brought a retaliation claim against the defendant. Plaintiff claimed that he was placed on probation and subsequently fired shortly after he filed age discrimination complaints with the EEOC. Id. at 95. In affirming the district court's decision to grant summary judgment, the Second Circuit found that the adverse employment actions were part, and the ultimate product, of "an extensive period of progressive discipline" which began five months prior to plaintiff's EEOC charges. Id. The Court stated that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Id.

In this case, the progressive discipline is well-documented and the exhibits that were submitted to the Court show that the decision-makers advised plaintiff of the next potential steps in each of the relevant documents. For example, the fine print on the bottom of each page of both counseling memos states, "Failure to demonstrate the necessary rate of improvement may be cause for additional action up to, and including, termination." (Def.'s Ex. 5, ECF No. 23-2; Def.'s Ex. 12, ECF No. 23-2.) Each progressive counseling memo also indicated the issues contained therein had previously been discussed with plaintiff. (Def.'s Ex. 5, ECF No. 23-2; Def.'s Ex. 12, ECF No. 23-2.) The first progressive counseling memo included a follow-up date, while the second progressive counseling memo indicated it was a "final written warning." (Def.'s Ex. 5, ECF No. 23-2; Def.'s Ex. 12, ECF No. 23-2.) Thus, although the discipline did escalate to a final warning and termination, these steps were part, and the ultimate product, of progressive discipline which began two months prior to plaintiff's request for accommodations and which related to performance issues that were raised by plaintiff's prior supervisor in the 60-day touchbase after, approximately five months before plaintiff engaged in the protected activity. As a result, the Court finds the Second Circuit's ruling in Slattery to be controlling.

Obviously, given the Court's ruling with respect to Counts One and Three, the plaintiff will be able to argue that the termination was tainted by discrimination because he was denied an accommodation that, according to plaintiff, would have remedied the alleged performance problems, but there is insufficient evidence to support the retaliation claim.[10]

The Court therefore GRANTS defendant's motion for summary judgment on plaintiff's retaliation claims under the ADA (Count Two) and CFEPA (Count Four).

### 3. Negligent Misrepresentation (Count Six)

To prove a claim for negligent misrepresentation, the plaintiff must demonstrate: "(1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." Coppola Const. Co., Inc. v. Hoffman Enters. Ltd. P'ship, 309 Conn. 342 (2013) (citation omitted). Each party's brief devotes less than two pages to the negligent misrepresentation claim, and that includes the general discussion of the legal elements.

---

[10] Plaintiff does not allege, nor does he produce any evidence to demonstrate, that Ramos and Langton were acting under the direction of Meehan, the only individual to know of plaintiff's disability and protected activity, in their decision to terminate plaintiff. See Summa v. Hofstra Univ., 708 F.3d 115, 127 (2d Cir. 2013).

Plaintiff argues that defendant's reasonable accommodation policy required it to consider plaintiff's request for accommodations and to take reasonable steps to accommodate him. (Pl.'s Br. 12, ECF No. 28.)  When plaintiff realized he needed accommodations to help him perform his tasks, he contacted human resources and requested accommodations.  (Id.) Plaintiff asserts that "Defendant denied Plaintiff's request for reasonable accommodations despite its represented policy of providing accommodations and shortly thereafter terminated Plaintiff's employment."  (Id.) Plaintiff alleges that he suffered significant harm and emotional distress due to defendant's failure to comply with the policy. (Id.)

Defendant argues that it received and considered plaintiff's request for accommodation in accordance with its policy but denied the accommodation because of the explicit expectation that Operations Directors be on site, the fact that no other Operations Directors had laptops, and because plaintiff had the ability to log on remotely from his desktop at home or return to the office whenever he wanted to work. (Def.'s Local Rule 52 Statement ¶ 15, ECF No. 23-2.)[11]

---

[11] Plaintiff admits these facts but denies that plaintiff requested the ability to work from home or off-site. (Pl.'s Local Rule 56(a)(2) ¶ 15, ECF No. 28-1.) Even assuming that plaintiff did not request the ability to work from home does not change the Court's analysis.

The employee handbook states that "[t]he company . . . provides reasonable accommodation for" disabled individuals under the ADA. (Def.'s Ex. 3, ECF No. 23-2.)  The representation made in the handbook is that defendant will consider the requested accommodation, which may be denied.

Plaintiff has not demonstrated that the defendant knew or should have known that any language in its employee handbook was false at the time that the statement was made. There is no allegation that defendant knew that it would not consider an employee's request for accommodation at the time the handbook was drafted. See Doe v. Wesleyan Univ., 19-cv-01519 (JBA), 2021 WL 664010, at *11 (D. Conn. Feb. 19, 2021). Nor could a jury plausibly infer that the statements in the handbook were false at the time the statements were made. See Mara v. MacNamara, 14-CV-01095 (RNC), 2015 WL 4392956, at *12 (D. Conn. July 15, 2015); Soares v. Altice Tech. Servs. US, LLC., No. 19-cv-1975 (JBA), 2021 WL 3475704, at *6 (D. Conn. Aug. 6, 2021); Presley v. Pepperidge Farm, Inc., 356 F. Supp. 2d 109, 135-36 (D. Conn. 2005). The mere fact that plaintiff did not receive the accommodation he requested does not make the statements in the handbook false.

Defendant's motion for summary judgment as to the negligent misrepresentation claim (Count Six) is GRANTED.

## **CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment (ECF No. 23-1) is GRANTED as to Counts Two, Four, Five, Six, and Seven and DENIED as to Counts One and Three.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. See 28 U.S.C. § 636(c)(3).

SO ORDERED this 31st day of March, 2022 at Hartford, Connecticut.

                                    /s/

                              Robert A. Richardson
                              United States Magistrate Judge